## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

AARON R. GOULD,        :
                          :

        Plaintiff     :    No. 3:15-CV-0110

vs.             :    (Judge Nealon)

CAROLYN W. COLVIN, Acting    :
Commissioner of Social Security,  :

        Defendant   :

**FILED**
**SCRANTON**
SEP 1 6 2016

Per_____
DEPUTY CLERK

### MEMORANDUM

On January 16, 2015, Plaintiff, Aaron R. Gould, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461 et seq. and U.S.C. § 1381, et seq., respectively. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] his applications for DIB and SSI on June 22, 2011, alleging disability beginning on August 19, 2009 due to hallucinations, arthritis, fibromyalgia, depression, and Post Traumatic Stress Disorder ("PTSD"). (Tr. 21, 190).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on March 20, 2012. (Tr. 21).  On April 4, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 21). An administrative hearing was held on July 31, 2013, before administrative law judge Susan Torres, ("ALJ"), at which Plaintiff and an impartial vocational expert Karen Kane, ("VE"), testified. (Tr. 40-68).  On September 19, 2013, the ALJ denied Plaintiff's claim. (Tr. 18-34).  On November 19, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3).  Thus, the ALJ's decision stood as the final decision of the

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on June 2, 2015. (Doc. 7).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

Commissioner.

Plaintiff filed the instant complaint on January 16, 2015. (Doc. 1). On June 2, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 6 and 7). Plaintiff filed a brief in support of his complaint on July 17, 2015. (Doc. 12). Defendant filed a brief in opposition on August 20, 2015. (Doc. 13). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on September 4, 1978, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 187). Plaintiff graduated from high school, and can communicate in English. (Tr. 189, 191). His employment records indicate that he previously worked as a dispatcher at several different manufacturing plants and was a former United States Marine. (Tr. 191, 217). The records of the SSA reveal that Plaintiff had earnings in the years 1999 through 2009. (138). Her annual earnings range from a low of ten thousand six hundred thirty-five dollars and forty cents ($10,635.40) in 1999 to a high of thirty-two thousand seven hundred seven dollars and thirteen cents

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

($32,707.13) in 2001. (Tr. 138). Her total earnings during those ten (10) years were two hundred thirty thousand eighty-four dollars and eighteen cents ($230,084.18). (Tr. 138).

In a document entitled "Function Report - Adult" filed with the SSA, Plaintiff indicated that he lived in a house with family. (Tr. 228). When asked how her injuries, illness or conditions limited his ability to work, Plaintiff stated:

> Dangerous to drive on because medication causes lapses of judgment. Extreme pain causes very short temper and poor judgment. Limited ability to write and type coherent thoughts, confuse others. Pain limits movements.

(Tr. 228). Plaintiff was able to care for his children with the help of his parents and took care of her personal needs with the help of his wife. (Tr. 229). He also was able to prepare frozen meals, do the laundry, an clean very rarely. (Tr. 230). His wife ended up performing most of these activities. (Tr. 230). He was able to walk only for short distances, and needed to rest for several minutes before resuming walking. (Tr. 233). When asked to check the items that his illnesses, injuries or conditions affected, Plaintiff did <u>not</u> check talking, hearing, seeing, concentration, or following instructions. (Tr. 233).

Regarding his concentration and memory, Plaintiff needed special reminders to take his medicine and go places, but not to take care of his personal needs. (Tr.

4

230, 232).  He was able to count change, but could not pay bills, handle a savings account, or use a checkbook because medications made his "judgments very questionable." (Tr. 231).  He was able to pay attention "for a good while" but was not able to finish what he started. (Tr. 233).  He followed written instruction well sometimes, but followed spoken instructions very poorly. (Tr. 233).  He did not handle stress or changes in routine well. (Tr. 234).

Socially, Plaintiff occasionally went outside, but that he could not go out alone or drive a car because hallucinations caused him to wander and his pain stranded him in places. (Tr. 231).  He very rarely left the house to shop for food. He did not spend time with others, but did leave the house to attend doctors' appointments. (Tr. 231-232).  He had problems getting along with family, friends, neighbors, and others because his pain caused him to have a short temper and his hallucinations confused others. (Tr. 233).

Plaintiff filled out a Supplemental Function Questionnaire for fatigue. (Tr. 236).  He states that his fatigue began "a few years ago" and worsened as his pain became more persistent. (Tr. 236).  He experienced fatigue most days for many hours, and nothing helped to relieve it. (Tr. 236).  Plaintiff also filled out a Supplemental Function Questionnaire for pain. (Tr. 237).  He indicated that his pain was "worst pain imaginable," that it has worsened as time went on, that it was

located in his back, muscles, hands, and joints, that it was worse in the morning, and that it was constant. (Tr. 237). Plaintiff stated he had taken medications and engaged in physical therapy, exercise, and acupuncture to relieve his pain. (Tr. 238).

At his hearing on July 31, 2013, Plaintiff testified that he had been disabled since August 19, 2009 due to a combination of fibromyalgia, major depression and anxiety, and PTSD. (Tr. 44). He testified that he stopped working on his alleged onset date "due to a breakdown of sorts at work" during which he was rambling on and crying uncontrollably. (Tr. 46). He stated that, at the time of his hearing, his mental health was not good because he was lashing out at people and was self-mutilating. (Tr. 46). He had been suicidal the three (3) weeks prior to the hearing. (Tr. 48). He stated that he wore bandages on his arms because he would engage in self-mutilation by cutting himself. (Tr. 52). He elaborated by explaining that he heard voices telling him to hurt himself or others. (Tr. 54).

He testified that a typical day for him involved having his wife wake him up and get him dressed because he had difficulties bending, then he would go downstairs and his wife would have to show him that there "was no one there" like robots or someone who was going to try to kill him. (Tr. 48-49). He testified that he said inappropriate things to people he did not know because he was afraid of

6

them. (Tr. 48). He therefore did not go out alone. (Tr. 53).

He had pain every day "on every portion of [his] skin except for his face" when someone brushed against him. (Tr. 49). He was only able to stand "for a little bit" before needing to lean on something for support, and could not sit for extended periods without changing positions. (Tr. 50). He very rarely slept during the day because he watching his children, ages six (6) and four (4) for nine (9) hours a day with the help of his parents. (Tr. 50, 52). He would sit on the patio and watch his children play, or force himself to walk them to the park or to see trains in town. (Tr. 58). He also tried to make them lunch and help his older child with learning how to read when he could, but would get frustrated and "angry far too quickly." (Tr. 59). He had difficulty lifting. (Tr. 51). He did not do yard work, cook, or clean. (Tr. 52).

He testified that his pain medications helped for about two (2) hours at a time, and allowed him to walk around the park. (Tr. 51). However, he testified that there were powerful side effects such as an inability to concentrate, constipation, horrible headaches, and grogginess. (Tr. 52).

## MEDICAL RECORDS

### A.   Physical Impairments

On September 3, 2009, Plaintiff had an appointment with Julio Ramos,

M.D., for evaluation of his axial osteoarthritis. (Tr. 312). It was noted that Plaintiff was switched from gabapentin to nortriptyline due to worsening depression from the gabapentin, but that his pain worsened as a result of this switch. (Tr. 312). On examination, Plaintiff had: paraspinal spasms over his cervical, thoracic, and lumbar spine; thirteen (13) out of eighteen (18) myofascial tender points; no inflammation over his upper and lower extremities; and a normal neurological examination. It was noted that Plaintiff had completed physical therapy and was walking for exercise. (Tr. 312). Plaintiff was restarted on gabapentin. (Tr. 312).

On November 3, 2009, Plaintiff had another appointment with Dr. Ramos, and reported that he still was experiencing sleep problems, hypersensitivity to touch, and widespread pain. (Tr. 314). On examination, Plaintiff had paraspinal spasms over his cervical, thoracic, and lumbar spine, and fifteen (15) out of eighteen (18) myofascial tender points. (Tr. 315).

On February 8, 2010, Plaintiff had an appointment with Dr. Ramos that revealed continual paraspinal spasms over the thoracic and lumbar spinal regions and multiple myofascial tender points. (Tr. 327). Dr. Ramos diagnosed Plaintiff with osteoarthritis of the lumbar spine with radiculopathy and of the cervical spine and with a history of fibromyalgia and chronic pain. (Tr. 327).

8

On February 12, 2010, Plaintiff underwent an MRI of the lumbar spine. (Tr. 323-324, 579-580). The impression was that Plaintiff had mild to moderate disc narrowing oat the T12-L1, L1-L2, and L5-S1 levels, an increased T2 signal in the L5-S1 level that suggested an annular tear, a small disc bulge at the L4-L5 level, and a minimal broad-based disc bulge at the L5-S1 level. (Tr. 323-324).

On May 3, 2010, Plaintiff had an appointment with Avner Griver, M.D., a pain management physician. (Tr. 329-31). An examination revealed Plaintiff had: tenderness to palpation over the lumbar, paraspinal, sacroiliac and gluteal areas; no atrophy; full strength; normal gait; intact sensation; a negative straight leg raising test; decreased flexion, extension, and rotation; and eighteen (18) out of eighteen (18) myofascial tender points. (Tr. 330). Dr. Griver diagnosed Plaintiff with fibromyalgia, depression, bipolar disorder, post traumatic stress disorder ("PTSD"), and low back pain. (Tr. 330). Dr. Griver recommended that Plaintiff engage in a stretching and aerobic program at home, use a TENS unit, and take either Savella, Cymbalta, or Lyrica. (Tr. 330).

On June 24, 2010, Plaintiff presented to the emergency room ("ER") for pain in his back, right hip, and right buttock due to a motor vehicle accident. (Tr. 369). Plaintiff's examination noted paraspinal tenderness in the lumbar spine and neck. (Tr. 376). Plaintiff was diagnosed with a hip contusion, back strain, and

acute exacerbation of chronic hip strain post- motor vehicle accident. (Tr. 378).

On July 13, 2010, Plaintiff had an appointment with Dr. Ramos, and reported to Dr. Ramos that he was doing "quite well" until he was in a motor vehicle accident. (Tr. 336). His examination revealed that he had minimal musculoskeletal, paraspinous spasms of the cervical, thoracic, and lumbar spine and intact joints. (Tr. 336). Plaintiff's osteoarthritis of his lumbar spine and lumbar radiculopathy were both listed as "stable." (Tr. 336). Dr. Ramos prescribed a Medrol dose pack and Vicodin. (Tr. 336).

On November 17, 2010, Plaintiff had an appointment with Dr. Ramos, and reported that he continuedto have pain in his lower lumbar spine with leg hyperesthesias with mild to moderate activity, but that he had been active and doing exercises. (Tr. 338). His examination revealed he had tenderness in his cervical, thoracic, and lumbar spine with intact joints. (Tr. 338). He was instructed to increase his Morphine Sulfate dos, continue taking Norco, and to use Etodolac and Flexeril as needed. (Tr. 338).

On April 5, 2011, Plaintiff presented to the ER due to back pain and bilateral numbness in his legs. (Tr. 287). An examination revealed Plaintiff had bilateral tenderness, spasm, and limited range of motion in his lumbar spine. (Tr. 287). He was diagnosed with musculoskeletal back pain, and was prescribed

10

Valium and Percocet. (Tr. 290).

On April 11, 2011, Plaintiff had an appointment with Dr. Ramos for a reevaluation of his history of axial osteoarthritis. (Tr. 343). Plaintiff reported severe back pain that was not relieved by prednisone, but was relieved by Valium that had been prescribed at a recent ER visit. (Tr. 343). It was noted that he had pain in his back in the cervical, thoracic, and lumbar spine that radiated into his legs. (Tr. 343). His examination revealed tenderness and paraspinous spasms in the cervical, thoracic, and lumbar spine and self-inflicted cuts to his bilateral arms secondary to PTSD. (Tr. 343). The Etodolac was discontinued, and Cymbalta was added, and he was instructed to call with any increase in pain rather than going to the ER. (Tr. 344).

On May 6, 2011, Plaintiff had an appointment with Dr. Ramos, and it was reported that Plaintiff had no significant change in his pain level, but did have improvement in his depression symptoms. (Tr. 341). His examination revealed that he had six (6) out of eighteen (18) tender points and minimal spasms, but an otherwise unremarkable neurological examination. (Tr. 341).

On July 8, 2011, Plaintiff had an appointment with Dr. Ramos for his continued osteoarthritis with cervical and lumbar radiculopathy. (Tr. 348).

Plaintiff noted that he had been increasing his activity level, was swimming, and was walking to help with recent weight gain, but that he continued to experience diffuse pain. (Tr. 348). His examination revealed that he had eighteen (18) out of eighteen (18) myfascial pain points with minimal spasms over the axial skeleton, but his neurological and skin exams were otherwise unremarkable. (Tr. 348). His assessment noted diagnoses that included degenerative joint disease of the cervical and lumbar spine, fibromyalgia, and a history of reactive depression and PTSD. (Tr. 348). Plaintiff was switched from Norco to Percocet, had his Cymbalta dose decreased due to weight gain, and was instructed to continue to increase his activity level to help with the weight gain. (Tr. 349).

On August 4, 2011, Plaintiff had an appointment with Dr. Ramos, and it which he reported that he had been engaging in a significant amount of activity that flared his lower back pain and caused a "significant worsening of his discomfort." (Tr. 351). On examination, he had two (2) out of eighteen (18) tender points and intact joints. (Tr. 351). His Cymbalta dose was increased, he was instructed to continue taking Morphine, Percocet, Etodolac and to discontinue Flexeril, was prescribed Zanaflex, and was instructed to use a TENS unit. (Tr. 352).

On September 8, 2011, Plaintiff had an appointment with Dr. Ramos. (Tr.

12

530). He reported that he had mildly worse joint pain when compared to his last visit, but that his generalized muscle pain was unchanged. (Tr. 530). He reported that his pain was located at the back of his neck and lower back, and that it was an aching, burning and unbearable pain that radiated to his buttocks and anterior thighs. (Tr. 530). His examination revealed that he had: a normal gait; tenderness and spasms in his neck and spine bilaterally; full range of motion in his spine; and four (4) out of eighteen (18) myofascial tender points. (Tr. 531).

On October 27, 2011, Plaintiff had a consultation appointment with Cynthia Cuyegkeng-Jose, M.D. at Geisinger Community Medical Center for persistent mid-thoracic back pain. (Tr. 404). His examination revealed that he had trigger points at the midback area corresponding to the paraspinal muscles across T11 and T12. Plaintiff received trigger point injections in the hope of alleviating his pain. (Tr. 405-406).

On November 2, 2011, Plaintiff underwent an MRI of his cervical spine. (Tr. 540). The impression was that Plaintiff's cervical spine was normal. (Tr. 540).

On February 1, 2012, Plaintiff had an appointment with Dr. Ramos, and reported that he felt "about the same compared to [his] last visit." (Tr. 533). It was noted that his condition had been mostly well-controlled since his last visit,

that Plaintiff reported having good and bad days, and that he was tolerating the medications, but was anxious to cut back on his narcotic analgesics. (Tr. 533). It was also noted that Plaintiff had pain in his neck, lower back, left wrist, left thumb, and left index finger that was described as aching, burning, and unbearable and radiated into his buttocks and anterior thighs. (Tr. 533). His examination revealed that he had: some tenderness and spasm in his neck and spine; a normal gait; a full range of motion in his neck, spine, and upper and lower extremities; and four (4) out of eighteen (18) myofascial tender points. (Tr. 533). Dr. Ramos' Assessment noted that Plaintiff had: spondylosis of the lumbar spine with myelopathy; neuritis or radiculitis of the thoracic or lumbosacral area; spondylosis of the cervical spine without myelopathy; brachial neuritis or radiculitis not otherwise specified; and joint pain in his forearm due to radial nerve injury. (Tr. 534). Plaintiff was instructed to increase his Topamax does and decrease his narcotics intake when his pain was under better control. (Tr. 534).

On March 3, 2012, Plaintiff had an appointment with Dr. Ramos, and reported that he was still having "a lot of pain," that Percocet was not working well enough, was very active with his children, and was exercising when he could. (Tr. 536). His examination noted Plaintiff had: tenderness and spasm in his cervical and lumbar spine; a normal gait; no muscle atrophy; decreased sensation

14

to light touch at his left hand index finger; and a minimal positive straight leg raise test bilaterally. (Tr. 537). Dr. Ramos noted that Plaintiff had several disc space narrowing areas with very minimal bulging that was not read on the report of his MRI of his neck. (Tr. 537). Plaintiff was instructed to continue his medications, home exercise, and aerobic exercise. (Tr. 537).

On March 5, 2012, Plaintiff underwent a consultative examination performed by Thomas Minora, M.D. (Tr. 429). On examination, Plaintiff had: a decreased range of motion in the lumbar region; trigger point tenderness; grossly intact cranial nerves; intact sensation to soft touch; no focal motor deficits in his upper and lower extremities; and full strength in all major muscle groups. (Tr. 425-28, 431). Dr. Minora's impression was that Plaintiff had fibromyalgia and depression. (Tr. 431). Dr. Minora filled out a medical source statement of Plaintiff's ability to perform work-related activities. (Tr. 423). Dr. Minora opined that Plaintiff could: frequently lift and/ or carry twenty-five (25) pounds; stand and walk for one (1) to two (2) hours in an eight (8) hour work day; sit for two (2) hours in an eight (8) hour work day; engage in unlimited pushing and pulling within the aforementioned weight restrictions; and occasionally bend, kneel, stoop, crouch, balance, and climb. (Tr. 423-424).

On March 19, 2012, Louis Bonita, M.D., a state agency physician,

15

reviewed the evidence and opined that Plaintiff could: (1) occasionally lift/ carry twenty (20) pounds; (2) frequently lift/ carry ten (10) pounds; (3) stand, walk, or sit for about six (6) hours in an eight (8) hour workday; and (4) engage in unlimited pushing and pulling within the aforementioned weight restrictions. (Tr. 135).

On April 26, 2012, Plaintiff had an appointment with Dr. Ramos, and reported that he was achy and sore, but feeling about the same since his last visit and hat his condition had been mostly well-controlled. (Tr. 538). On examination, Plaintiff had: minimal tenderness of his cervical spine; no spasms; no tender or swollen joints; normal strength and sensation; and minimal hyperesthesias over the anterior thigh that was otherwise normal to light touch. (Tr. 539).

An MRI of Plaintiff's lumbar spine from June 13, 2012 showed minimal right-sided neuroforaminal stenosis at the L4-L5 level and mild degenerative changes at the L5-S1 level with no stenosis. (Tr. 1066-67). Plaintiff continued to complain about headaches; however, Plaintiff did not have any significant clinical findings on examination (Tr. 667-68, 761-822, 836-72).

On July 17, 2012, Plaintiff had an appointment with Marianne Santioni, M.D, a Rheumatologist. (Tr. 607). Plaintiff's examination revealed eighteen (18)

16

out of eighteen (18) tender points and decreased range of motion. (Tr. 607).

Plaintiff was diagnosed with fibromyalgia and spondyloarthropathy. (Tr. 607).

On September 11, 2012, Plaintiff had another appointment with Dr. Santioni. (Tr. 606). His examination revealed eighteen (18) out of eighteen (18) tender points, decreased range of motion, and bilateral wrist tenderness. (Tr. 606). Dr. Santioni prescribed Percocet. (Tr. 606).

On December 13, 2012, Plaintiff had an appointment with Dr. Santioni. (Tr. 604). Plaintiff reported that he was able to get six (6) to seven (7) hours of pain relief with his medication. (Tr. 604). His examination revealed very limited range of motion through the lumbar spine and significant tenderness through the paravertebral muscles in the lumbar area, as well as multiple tender points consistent with fibromyalgia. (Tr. 604). Plaintiff was instructed to discontinue Percocet and was prescribed MS Contin in its place. (Tr. 604).

On March 19, 2013, Plaintiff had an appointment with Dr. Santioni. (Tr. 603). Plaintiff reported difficulty walking any distance and bilateral hand pain. (Tr. 603). His examination revealed decreased range of motion, tenderness in the interphalangeal joints of the hands, and eighteen (18) out of eighteen (18) positive tender points. (Tr. 603).

On June 13, 2013, Plaintiff had an appointment with Dr. Santioni. (Tr.

17

602).  His examination revealed eighteen (18) out eighteen (18)  positive tender

points and a decreased range of motion in the lumbar spine.  (Tr. 602).  On that

same date, Dr. Santioni completed a Multiple Impairment Questionnaire.  (Tr.

646-653).   Initially, Dr. Santioni noted Plaintiff's diagnoses to include

spondyloarthropathy and fibromyalgia.  (Tr. 646).   Clinical findings included

eighteen (18) out of eighteen (18) positive tender points and decreased range of

motion in the lumbar spine.  (Tr. 646).  Dr. Santioni cited to an MRI of the

lumbar spine, and laboratory blood tests in support of her diagnoses.  (Tr. 647).

Plaintiff's symptoms included constant back pain with radicular complaints and

numbness in the left leg at times, precipitated by exertion.   (Tr. 647-648).

Plaintiff's pain as was a nine (9) to ten (10) on a ten (10) point scale, and his

fatigue was a four (4) to five (5) on a ten (10) point scale.  (Tr. 648).  Dr. Santioni

opined that in an 8-hour workday, Plaintiff could: (1) sit for one (1) hour; (2)

stand/walk for two (2) hours, and must get up every ten (10) minutes when sitting

and move around for ten (10) minutes before sitting again; (3) frequently lift/carry

five (5) pounds and occasionally lift/carry twenty (20) pounds.  (Tr. 648-649).  Dr.

Santioni also opined that Plaintiff had significant limitations performing repetitive

reaching, handling, fingering, or lifting because of neck discomfort; was markedly

limited in the ability to use the upper extremities to grasp, turn, and

18

twist objects, use the fingers/hands for fine manipulations, and use the arms for reaching, including overhead; that his symptoms were constantly severe enough to interfere with his attention and concentration; that he was not a maligerer; that he was incapable to tolerating low stress; that he would need to take unscheduled breaks to rest every fifteen (15) minutes during an eight (8) hour workday, each lasting five (5) to ten (10) minutes on average; and that he was likely to be absent from work more than three (3) times per month. (Tr. 649- 652).

### B.   Mental Impairments

On September 7, 2009, Plaintiff had an appointment with Sandra Burns, PhD for mental health issues including hallucinations, delusions, and self-mutilation. (Tr. 464).

On September 24, 2009, Plaintiff had an appointment with M.A. Rahman, M.D. for chronic suicidal thoughts, poor concentration, poor sleep, a depressed mood, and mood swings that had worsened over time. (Tr. 466). His mental status examination revealed that Plaintiff had an anxious mood, an appropriate affect, fair attention anc concentration, an intact memory, and good insight and judgment. (Tr. 466). Plaintiff was noted to be cooperative and oriented in all spheres. (Tr. 466). Dr. Rahman's impression was that Plaintiff had Bipolar Disorder, and to rule out Major Depressive Disorder and Attention Deficit

Hyperactivity Disorder. (Tr. 466).

On October 12, 2009, Dr. Burns opined that Plaintiff was totally disabled as of August 20, 2009 under 297.1, 307.89, and 71.09. (Tr. 455). She opined that Plaintiff had: fair ability with judgment and decision making, functioning independently, and emotional lability; guarded/ poor ability with dealing with work stresses, concentration/ attention span, and his overall prognosis; and excellent ability to follow recommendations. (Tr. 455).

On October 15, 2009, Plaintiff had an appointment with Dr. Rahman. (Tr. 468). It was noted that Plaintiff had an anxious and depressed mood, hallucinations, and an intense affect. (Tr. 468).

On November 12, 2009, Dr. Burns opined that Plaintiff was totally disabled as of August 20, 2009 under 297.1, 307.89, and 71.09. (Tr. 454). She opined that Plaintiff had: fair ability with judgment and decision making, functioning independently, and emotional lability; guarded/ poor ability with dealing with work stresses, concentration/ attention span, and his overall prognosis; and excellent ability to follow recommendations. (Tr. 454).

On November 15, 2009, Plaintiff had an appointment with Dr. Rahman. (Tr. 470). It was noted that Plaintiff was anxious, friendly, and cooperative, had an appropriate affect, was oriented, and denied suicidal or homicidal ideations.

(Tr. 470).

On December 12, 2009, Dr. Burns opined that Plaintiff was totally disabled as of August 20, 2009 under 297.1, 307.89, and 71.09. (Tr. 453). She opined that Plaintiff had: fair ability with judgment and decision making, functioning independently, and emotional lability; guarded/ poor ability with dealing with work stresses, concentration/ attention span, and his overall prognosis; and excellent ability to follow recommendations. (Tr. 453).

On December 30, 2009, Plaintiff had an appointment with Dr. Rahman. (Tr. 472). It was noted that Plaintiff had a depressed mood and an appropriate affect and was oriented. (Tr. 472).

On January 1, 2010, Dr. Burns opined that Plaintiff was totally disabled as of August 20, 2009 under 297.1, 307.89, and 71.09. (Tr. 452). She opined that Plaintiff had: fair ability with judgment and decision making, functioning independently, and emotional lability; guarded/ poor ability with dealing with work stresses, concentration/ attention span, and his overall prognosis; and excellent ability to follow recommendations. (Tr. 452).

On February 3, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 474). Plaintiff had an appropriate affect and depressed mood and was oriented. (Tr. 474).

21

On March 3, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 476). It was noted that Plaintiff had a friendly, depressed, and cooperative mood and an appropriate affect and that he was oriented and non-psychotic. (Tr. 476).

On March 8, 2010, Dr. Burns opined that Plaintiff was totally disabled as of August 20, 2009 under 297.1, 307.89, and 71.09. (Tr. 451). She opined that Plaintiff had: fair ability with judgment and decision making and functioning independently; guarded/ poor ability with dealing with work stresses, emotional lability, concentration/ attention span, and his overall prognosis; and excellent ability to follow recommendations. (Tr. 451).

On April 7, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 478). It was noted that Plaintiff had a euthymic, friendly, alert, and cooperative mood and an appropriate affect, and that he was non-psychotic. (Tr. 478).

On June 3, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 480). It was noted that Plaintiff had a euthymic, friendly, and cooperative mood and an appropriate affect, and that she was non-psychotic and oriented. (Tr. 480). Plaintiff reported that his medications were helpful and that he had no side-effects. (Tr. 480).

On June 22, 2010, Dr. Burns opined that Plaintiff was totally disabled as of August 20, 2009 under 297.1, 307.89, and 71.09. (Tr. 450). She opined that

22

Plaintiff had: fair ability with judgment and decision making, functioning independently, and emotional lability; guarded/ poor ability with dealing with work stresses, concentration/ attention span, and his overall prognosis; and excellent ability to follow recommendations. (Tr. 450).

On August 4, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 482). It was noted that Plaintiff had a euthymic, friendly, and cooperative mood and an appropriate affect, and that she was non-psychotic and oriented. (Tr. 482). Plaintiff reported that his medications were helpful and that he had no side-effects. (Tr. 482).

On September 29, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 484). It was noted that Plaintiff had a euthymic, friendly, and cooperative mood and an appropriate affect, and that she was non-psychotic and oriented. (Tr. 484). Plaintiff reported that his medications were helpful and that he had no side-effects. (Tr. 484).

On November 15, 2010, Plaintiff had an appointment with Dr. Rahman. (Tr. 486). It was noted that Plaintiff had a euthymic, friendly, and cooperative mood and an appropriate affect, and that she was non-psychotic and oriented. (Tr. 486). Plaintiff reported that his medications were helpful and that he had no side-effects. (Tr. 486).

On January 13, 2011, Plaintiff had an appointment with Dr. Rahman. (Tr. 488). It was noted that Plaintiff had a euthymic, friendly, and cooperative mood and an appropriate affect, and that she was non-psychotic and oriented. (Tr. 488). Plaintiff reported that his medications were helpful and that he had no side-effects. (Tr. 488).

On January 13, 2011, Dr. Burns opined that Plaintiff was totally and permanently incapacitated under 297.1. (Tr. 449). It was noted that Plaintiff's symptoms included hallucinations, self-mutilation, and delusional thinking. (Tr. 449).

On March 10, 2011, Dr. Burns terminated Plaintiff's care due to lack of attendance (Tr. 276, 279).

On January 5, 2012, Plaintiff had an appointment with Tiffany Griffiths, PsyD, for a consultative examination. (Tr. 414-421). Dr. Griffiths opined that Plaintiff had slight restrictions in his ability to understand, remember, and carry out simple and short instructions; a moderate restriction in his ability to understand, remember, and carry out detailed instructions; and no restrictions in his ability to make judgments on simple work-related decisions. (Tr. 415). She also opined that Plaintiff had moderate restrictions in his ability to interact appropriately with the public, supervisors, and co-workers; a marked restriction in

his ability to respond appropriately to work pressures in a usual work setting; and

a mild restriction in his ability to respond appropriately to changes in a routine

work setting. (Tr. 415). When asked what medical or clinical findings supported

her assessment, Dr. Griffiths left that section blank. (Tr. 416).

On March 5, 2012, Thomas Fink, Ph.D., a state agency

psychologist, determined, after reviewing the record up until that date, that

Plaintiff had mild restrictions in activities of daily living, moderate difficulties in

maintaining social functioning and in maintaining concentration, persistence, or

pace, and had no repeated episodes of decompensation. (Tr. 132).  In Mental

Residual Functional Capacity Assessment, Dr. Fink opined that Plaintiff was not

significantly limited in his ability to: carry out short and simple or detailed

instructions; perform activities within a schedule, maintain regular attendance, and

be punctual within customary tolerances; to sustain an ordinary routine without

special supervision; to work in coordination with or in proximity to others without

being distracted by them; to make simple work-related decisions; to complete a

normal workday and workweek without interruptions from psychologically based

symptoms; to perform at a consistent pace without an unreasonable number and

length of rest periods; to ask simple questions or request assistance; to get along

with coworkers or peers without distracting them or exhibiting behavioral

extremes; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 135-136).  He further opined that Plaintiff was moderately limited in his ability to: maintain attention and concentration for extended periods; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. (Tr. 135-136).

On March 8, 2012, Plaintiff had an appointment with Dr. Rahman for racing thoughts, cutting himself, poor concentration, and seeing thing in the dark.  (Tr. 490).  His examination revealed that he was cooperative and oriented in all spheres, had a depressed mood and appropriate affect, had poor concentration and attention, had fair memory, had good insight and judgment, and denied suicidal or homicidal ideation. (Tr. 490).  Plaintiff requested to restart medication including Lamictal. (Tr. 491).  He was also prescribed Adderall and Klonopin.  (Tr. 491).

On April 5, 2012, Plaintiff had an appointment with Dr. Rahman.  (Tr. 492). It was noted that Plaintiff had an anxious mood and appropriate affect, and hallucinations.  It was also noted that his medications were helpful and did not cause any side effects. (Tr. 492).

On May 3, 2012, Plaintiff had an appointment with Dr. Rahman. (Tr. 494). It was noted that Plaintiff had a euthymic, friendly, and cooperative mood and an

appropriate affect, and that she was non-psychotic and oriented. (Tr. 494).

Plaintiff reported that his medications were helpful and that he had no side-effects.

(Tr. 494).

On June 11, 2012, Plaintiff had an intake appointment with Danilo DeSoto,

M.D. for his ongoing psychiatric issues. (Tr. 1097). On examination, Plaintiff

was anxious, cooperative, depressed, fearful, and sad, reported experiencing

hallucinations, and had inappropriate guilt, obsessions, paranoia, thoughts of

worthlessness and hopelessness, suicidal thoughts, clear speech, coherent and

logical thought processes, intact associative thinking, intact memory, a normal

attention span and concentration, and intact and realistic judgment and insight.

(Tr. 1099). Dr. DeSoto diagnosed Plaintiff with Depressive Disorder, major,

recurrent; PTSD; and Panic Disorder without agoraphobia. (Tr. 1099). Dr.

DeSoto prescribed Seroquel.

On June 15, 2012, Plaintiff had a follow-up appointment with Dr. DeSoto.

(Tr. 1093). He had stopped taking the Seroquel because of side effects. (Tr.

1093). On examination, Plaintiff had a depressed mood, hallucinations, paranoia,

thoughts of worthlessness and hopelessness, preoccupations, obsessions,

unrealistic judgment, lack of insight, normal attention span and concentration,

intact associative thinking, intact language processing, and a coherent and logical

27

thought process. (Tr. 1095). Plaintiff was assessed with a GAF of forty-five (45). (Tr. 1095). Dr. DeSoto prescribed Latuda. (Tr. 1095).

On July 13, 2012, Plaintiff had a follow-up appointment with Dr. DeSoto. (Tr. 1089-1092). His mental status examination was the same as his prior appointment with Dr. DeSoto. (Tr. 1089-1092). Dr. DeSoto instructed Plaintiff to discontinue taking Latuda and to instead take Lamictal. (Tr. 1091).

On August 3, 2012, Plaintiff had a follow-up appointment with Dr. DeSoto. (Tr. 1085-1087). Again, his mental status examination remained unchanged, but Dr. DeSoto prescribed Wellbutrin to be taken with Lamictal. (Tr. 1085-1087). On this same date, Dr. DeSoto wrote a letter that noted that Plaintiff had been under his care for treatment of Schizoaffective Disorder, Major Depressive Disorder, PTSD, and Panic Disorder. (Tr. 447). He opined that Plaintiff should remain off work for the next twelve (12) months until his mood and anxiety level became more stabilized. (Tr. 447).

On March 6, 2013, Plaintiff had an appointment with Dr. DeSoto for increased depression, anxiety and self-mutilation. (Tr. 1081). His mental status examination revealed he: was cooperative and depressed; had an appropriate affect, clear speech, lacking insight, unrealistic judgment, intact language processing, coherent and logical thought processes, intact associative thinking,

28

hallucinations, obsessions, paranoia, preoccupations, thoughts of worthlessness and hopelessness; and did not have suicidal or homicidal thoughts. (Tr. 1083).

On March 20, 2013, Plaintiff had another appointment with Dr. DeSoto for worsening anxiety and depression and self-mutilation. (Tr. 1077). It was noted that he had been experiencing difficulty sleeping and suicidal thoughts. (Tr. 1077). A mental status examination revealed: a depressed and subdued mood; a depressed affect; poor eye contact; hallucinations; inappropriate guilt; obsessions; paranoia; thoughts of worthlessness and hopelessness; unrealistic judgment; and lack of insight. (Tr. 1077-1080). Dr. DeSoto diagnosed Plaintiff with Depressive Disorder, PTSD, Depressive Disorder, and psychotic disorder with hallucinations. Mr. Gould's Global Assessment of Functioning ("GAF") score was twenty-five (25). (Tr. 1080).

On March 20, 2013, Dr. DeSoto admitted Plaintiff to Geisinger Community Medical Center's psychiatric department for inpatient treatment of exacerbation of depression, self-damaging behavior, and thoughts of suicide. (Tr. 704, 1080). He was discharged on March 26, 2013. (Tr. 704). Upon discharge, his mental status examination revealed that he: was alert, relatively calm, and passively cooperative; had coherent speech, a subdued mood, a relevant thought process, and intact memory, judgment, insight, and reality contact; had no overt delusions or

hallucinations; and was not suicidal or homicidal. (Tr. 704-705). Plaintiff was diagnosed with Bipolar Disorder, mixed phase, and assessed given a GAF score of sixty (60). (Tr. 704).

On March 28, 2013, Plaintiff had a post-hospitalization appointment with Dr. DeSoto. (Tr. 1073). His mental status exam revealed unrealistic judgment, hallucinations, a lack of insight, a depressed mood, intact associative thinking, intact language processing, coherent and logical thought processes, clear speech, and an affect appropriate to his mood. (Tr. 1075). Plaintiff reported that his anxiety, anhedonia, feelings of helplessness, delusions, depressed feelings, hallucinations, racing thoughts, ruminations, and sadness all decreased. (Tr. 1073). His GAF was assessed as forty-five (45). (Tr. 1075).

On April 12, 2013, Plaintiff had an appointment with Dr. DeSoto. (Tr. 1120-1123). His mental status examination was unchanged from a prior appointment. (Tr. 1120-1123). Plaintiff was instructed to increase his Risperdal dose. (Tr. 1122).

On May 3, 2013, Plaintiff had a follow-up appointment with Dr. DeSoto. (Tr. 1118). His mental status examination was again unchanged. (Tr. 1116). His GAF improved slightly to a fifty (50). (Tr. 1118). He was instructed to increase his Topamax dose. (Tr. 1118).

On May 24, 2013, Plaintiff had an appointment with Dr. DeSoto. (Tr. 1114). His mental status examination revealed a depressed mood. (Tr. 1112). Plaintiff's dose of Risperdal was increased. (Tr. 1112).

On June 14, 2013, Plaintiff had an appointment with Dr. DeSoto, at which he stated, "I'm not that good." (Tr. 1108). He reported frequent auditory and visual hallucinations, a declining mood, difficulty sleeping, worsening anxiety, increased anhedonia, poor concentration, decreased crying episodes, ongoing depressed feelings, a fair energy level, decreased feelings of helplessness and hopelessness, increased isolative behavior, increased racing thoughts, poor motivation, increased ruminations, and increased sadness. (Tr. 1108). His mental status examination revealed a cooperative attitude, clear speech, intact language processing, coherent and logical thought processes, intact associative thinking, a lack of hallucinations and delusions, a lack of obsessions and preoccupations, intact recent and remote memory, normal attention span and concentration, intact judgment, intact insight, and a lack of suicidal and homicidal thoughts. (Tr. 1110). In Dr. DeSoto's assessment, it was noted that Plaintiff's anxiety, depression, and PTSD were improving. (Tr. 1110). Plaintiff's dose of Risperdal was increased. (Tr. 1110).

On June 28, 2013, Plaintiff had an appointment with Dr. DeSoto, and

31

reported that his symptoms were unchanged, that he felt "ok," and that he had continued to have difficulty sleeping, auditory and visual hallucinations, but that his anxiety, depression, feelings of helplessness, hallucinations, and feelings of hopelessness had decreased. (Tr. 1104). He also reported that his concentration was fair, he did not have suicidal or homicidal thoughts, he felt less overwhelmed, and was taking his medications as prescribed. (Tr. 1104). His mental status examination revealed a depressed mood, a comfortable patient, a cooperative attitude, an affect appropriate to mood, clear speech, intact language processing, coherent and logical thought processes, intact associative thinking, and a lack of delusions, hallucinations, obsessions, preoccupations, somatic thoughts, and suicidal or homicidal thinking. (Tr. 1106). Dr. DeSoto noted that Plaintiff anxiety, depression, and PTSD were improving. (Tr. 1106).

On August 15, 2013, Plaintiff had an appointment with Matthew Berger, M.D., Dr. DeSoto's colleague. (Tr. 1100). He reported that continued to experience depression, auditory and visual hallucinations, racing thoughts at night, and difficulty sleeping. (Tr. 1100). It was noted that as a former United States Marine, he witnessed "a lot of death in combat," and that he was also in the second tower of the World Trade Center when the plane hit. (Tr. 1100). His mental status examination revealed a depressed mood, clear speech, intact language processing

32

and associative thinking, a lack of delusions, intact and realistic judgment, and intact insight. (Tr. 1102-1103). Plaintiff's GAF score was a fifty-five (55). (Tr. 1103). Dr. Berger diagnosed Plaintiff with PTSD and Depressive Disorder, major, recurrent, and moderate. (Tr. 1103). Dr. Berger prescribed Zoloft and Klonopin. (Tr. 1103).

On September 3, 2013, Plaintiff had an appointment with Dr. Berger. (Tr. 1124-1131). He noted Plaintiff had experienced emotional lability, poor memory, delusions and hallucinations, sleep disturbance, mood disturbance, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, recurrent panic attacks, anhedonia or pervasive loss of interests, suicidal ideation or attempts, oddities of thought perception, speech, or behavior, social withdrawal or isolation, blunt, flat, or inappropriate affect, illogical thinking or loosening of associations, decreased energy, manic syndrome, obsessions or compulsions, intrusive recollections of a traumatic experience, persistent irrational fears, generalized persistent anxiety, and hostility and irritability. (Tr. 1125). Plaintiff reported that his symptoms included visual and auditory hallucinations, severe mood lability, frequent panic attacks, depression, social isolation and withdrawal, and poor impulse control and poor coping strategies. (Tr. 1126). Dr. Berger completed a Psychiatric/ Psychological Impairment Questionnaire, in

33

which he opined that Plaintiff: (1) was markedly limited in the ability to remember locations and work like procedures, understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance, sustain ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and to adhere to basic standards or neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel to unfamiliar places and use public transportation, and set realistic goals or make plans independently; (2) would experience episodes of deterioration or decompensation in work or work like settings as his symptoms were "exacerbated by stressors, particularly in the workplace;" (3) was not a malingerer; (4) was incapable of tolerating even low stress because of poor coping strategies and poor impulse

34

control; and (5) was likely to be absent from work more than three times a month. (Tr. 1126-1131). It was also noted that Plaintiff's pain was exacerbated by his declining psychiatric condition.

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe

35

v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work. For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant

> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time

38

employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

**ALJ DECISION**

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2014.  (Tr. 13).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of August 19, 2009. (Tr. 21).

39

At step two, the ALJ determined that Plaintiff suffered from the severe[7] combination of impairments of the following: "fibromyalgia, lumbar disc disease, bipolar disorder, major depressive disorder, attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), panic disorder and psychotic disorder (20 C.F.R. 404.1520(c))." (Tr. 23).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 24-26).

At step four, the ALJ determined that Plaintiff had the Residual Functional Capacity ("RFC") to perform light work with restrictions. (Tr. 26-32). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) except that [Plaintiff] can

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. [Plaintiff] can occasionally balance, stoop, kneel, crouch or crawl. [Plaintiff] must avoid concentrated exposure to vibration and hazards such as heights and moving machiner. [Plaintiff] can understand, remember and carry out simple instructions in an environment free of fast-paced production requirements involving only simple work-related decisions with few workplace changes. [Plaintiff] can have occasional interaction with supervisors and co-workers, but no interaction with the public.

(Tr. 26).

At step five of the sequential evaluation process, the ALJ determined that, given Plaintiff's RFC, he was unable to perform any past relevant work, but that considering his age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform. (Tr. 32-34).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between August 19, 2009, the alleged onset date, through the date of the ALJ's decision. (Tr. 34).

**DISCUSSION**

On appeal, Plaintiff asserts the following arguments: (1) the ALJ did not properly weight the medical evidence; (2) the ALJ failed to properly evaluate Plaintiff's credibility (Doc. 12, pp. 19-31). Defendant disputes these contentions. (Doc. 13, pp. 16-27).

41

1. **Medical Opinion Evidence**

Plaintiff argues that the ALJ erred in the weight she assigned to the medical opinion evidence because the ALJ's explanation that certain opinions should be afforded less or limited weight due to inconsistent medical evidence was not supported by the record and because the state agency physician's opinion regarding Plaintiff's Mental RFC did not include a review of the entire medical record, namely the visits Plaintiff had with Dr. DeSoto and Dr. Berger. (Doc. 12, pp. 19-28).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit

in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18. It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion. 20 C.F.R. § 416.927. The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record. See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Additionally, the Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.).

Regarding the relevant medical opinion evidence of Plaintiff's mental RFC, the ALJ gave little weight to the opinion of Dr. DeSoto rendered on August 3, 2012 that Plaintiff was indefinitely disabled because it did "not contain a psychological functional assessment of [Plaintiff] and is inconsistent with the clinical findings in the treatment records.  Further, [Plaintiff] had just began treatment in June of 2012 after reporting to his psychiatrist that his medications were extremely helpful, which lessens the credibility of the statement of Dr. DeSoto." (Tr. 32).

The ALJ gave limited weight to the opinion of Dr. Berger that Plaintiff would have marked limitations in understanding and memory, sustained concentration and persistence, social interaction and adaptation with the exception

44

of simple tasks, instructions, questions and decisions because it was "inconsistent

with his GAF assessment, the prior clinical findings and [Plaintiff's] activity level,

which involves taking care of two small children." (Tr. 32).

Instead, the ALJ gave great weight to the opinion of the non-examining,

state agency psychologist, namely Dr. Fink, who performed a consultative

examination because it was "consistent with the longitudinal review of [Plaintiff's]

treatment records, findings on mental status examination and psychological

assessments." (Tr. 32).

Upon review of the entire record and the ALJ's RFC determination, it is

determined that the ALJ improperly afforded great weight to the opinion of state

agency physician, Dr. Fink, in reaching the mental RFC determination because the

state agency examination record indicates that the whole medical record was not

available for review. (Tr. 127-137). While the medical records up to the date Dr.

Fink rendered his opinion on March 5, 2012 were included, what was not

reviewed and therefore excluded from Dr. Fink's review were the medical records

from the exams that took place after Dr. Fink rendered this opinion, which

included a multitude of visits to Dr. DeSoto and Dr. Berger, both of whom issued

opinions regarding Plaintiff's mental RFC. (Tr. 1073-1131). As discussed, in

order for the ALJ to properly give any weight to a medical opinion, the entire

medical record must have been available for and reviewed by the non-examining,

non-treating physician.  See Sassone, 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of the entire record).  However, in the case at hand, the entire medical record was not available to the non-examining, non-treating physician, Dr. Fink, whose opinion regarding Plaintiff's mental RFC was afforded great weight by the ALJ.

Therefore, because the opinion of the state agency physician was not well-supported by the entire record as it did not include a review of the entire record, including many visits and exams that occurred with Dr. DeSoto and Dr. Berger after the state agency physician opinion was issued on March 5, 2012, substantial evidence does not support the RFC determination.  As such, remand on this basis is necessary, and this Court declines to address Plaintiff's remaining assertions.

**CONCLUSION**

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: September 16, 2016

/s/ William J. Nealon
**United States District Judge**